AMERICAN STORES DAIRY COMPANY, Appellant, vs. DEPARTMENT OF TAXATION, Respondent.*

*November 13, 1944—February 13, 1945.*

---

* Motion for rehearing denied, with $25 costs, on May 1, 1945.

For the appellant there were briefs by *Lecher, Michael, Spohn & Best* of Milwaukee, and oral argument by *George D. Spohn* and *John S. Best.*

For the respondent there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

FOWLER, J.    The case is an appeal from a judgment of the circuit court for Dane county confirming an additional income tax imposed by the Wisconsin board of tax appeals, hereinafter referred to as "the board," against the American Stores Dairy Company, hereinafter referred to as the

"Dairy Company." The Wisconsin Department of Taxation, hereinafter referred to as the "department" originally imposed the tax involved pursuant to a field audit in addition to the taxes paid during the period involved by the taxpayer according to its own reports. The taxpayer appealed to the board for a review of the department's proceedings. The board modified the tax as imposed by the department by disallowing one item included by the department and confirmed the decision of the department as to the other portion. The department does not here contest the board's disallowance. We therefore do not consider the board's disallowance.

The Dairy Company is a Delaware corporation organized in 1928 when the American Stores Company, also a Delaware corporation, hereinafter referred to as the "Stores Company," purchased a milk condensary located at Neillsville, Wisconsin. The Stores Company issued to itself all the stock of the Dairy Company and still owns and holds it. The entire product of the Dairy Company is evaporated milk which it puts up in cans packed in cases. The Stores Company takes the entire output of the Dairy Company at a price of twenty-five cents per case less than advertised brands of evaporated milk can be purchased on the market at the time it is taken over. It is thus obvious that there is neither need nor occasion for the Dairy Company to go to any expense for advertising its product. However, in computing its income taxes for the years 1936, 1938, and 1939 to get its tax base it deducted from the amount received from the Stores Company for its product as an expense of doing its business, the sum of $170,000 which it paid to the Stores Company to reimburse it for sums paid by it for advertising the Dairy Company product which the Stores Company sold in retail stores conducted by it under the Stores Company's own private brand. The department, the board, and the circuit court included in the tax base upon which the Dairy Company's income tax was com-

puted this sum of $170,000. The controversy between the department and the Dairy Company hinges on whether this $170,000 should be included in or excluded from the tax base.

The Dairy Company claims, (1) that the $170,000 should be excluded from the tax base; and (2) that its income arises in part from business conducted outside the state of Wisconsin; that its liability to the state for an income tax is limited by the statute to income derived from business transacted within the state; and that the tax in suit was computed on the assumption that the Dairy Company's entire net income was in fact derived from business transacted within this state, whereas its income should have been prorated under the statutes to inside and outside business and its tax computed upon the income derived from the inside business.

(1) The board in modifying the tax involved acted upon its interpretation of sec. 71.25 (1) and (2), Stats. These subsections are set out in the margin.[1] The board's inter-

[1] Sec. 71.25 *Corporate tax evasion prevented.* (1) When any corporation liable to taxation under this act conducts its business in such a manner as either directly or indirectly to benefit the members or stockholders thereof or any person interested in such business, by selling its products or the goods or commodities in which it deals at less than the fair price which might be obtained therefor, or where a corporation, a substantial portion of whose capital stock is owned either directly or indirectly by another corporation, acquires and disposes of the products of the corporation so owning a substantial portion of its stock in such manner as to create a loss or improper net income, the department may determine the amount of taxable income of such corporation for the calendar or fiscal year, having due regard to the reasonable profits which but for such arrangements or understanding might or could have been obtained from dealing in such products, goods or commodities.

(2) For the purpose of this chapter, whenever a corporation which is required to file an income tax return, is affiliated with or related to any other corporation through stock ownership by the same interests or as parent or subsidiary corporations, or whose income is regulated through contract or other arrangement, the department of taxation may require such consolidated statements as in its opinion are necessary in order to determine the taxable income received by any one of the affiliated or related corporations.

pretation of sub. (1) is succinctly stated by the board in its decision as follows:

"An analysis of subsection (1) of section 71.25 discloses that when a corporation conducts its business so as to directly or indirectly benefit the members or stockholders of the parent by selling its product at less than a fair price, or where a corporation whose stock is substantially owned either directly or indirectly by another corporation, acquires and disposes of the products of the parent company in such a manner so as to create an artificial loss or improper net income, the department may justly determine the amount of taxable income. *Curtis Companies, Inc., v. Tax Commission,* 214 Wis. 85. See also *Northern States Power Co. v. Tax Commission,* 237 Wis. 433, and *Burroughs Adding Machine Co. v. Tax Commission,* 237 Wis. 423."

The board further states that the decisions above cited "establish the conclusion that the respondent [Department] has a statutory right to inquire into the intercorporate agreements between a parent [Stores Company] and a subsidiary [Dairy Company]." We consider the above a fair summary of sub. (1) and the interpretation of it given by the cases cited.

It seems to us manifest, as above stated, that under the practice existing between the Dairy Company and the Stores Company there was neither need nor occasion for the Dairy Company to pay anything to the Stores Company for advertising its product. The Dairy Company was a manufacturing company solely. The Stores Company took the Dairy Company's entire product at an agreed price which was fixed according to a uniform practice. The Stores Company is a chain-store company operating some two thousand five hundred chain stores in several eastern states. It sold the Dairy Company's product at retail in these stores. It had no stores in Wisconsin and sold none of the Dairy Company's product in Wisconsin. If advertising that product was necessary or advisable to enable the Stores

Company to dispose of that product which it took over that was solely the Stores Company's affair. The allowance of the sums to the Stores Company for advertising was a pure gift. It in fact took the form of a gift by the very terms of the resolutions of the Dairy Company on which the sums were paid. A 1939 resolution reads as follows and the resolutions on which the other payments for advertising were made are of like tenure:

"Resolved, that the American Stores Dairy Company reimburse the American Stores Company the sum of thirty-five thousand dollars in payment of the above expense [paid by the Stores Company for advertising its private brand of evaporated milk] and that Mr. C. H. Bingham be instructed to draw and mail a check in the amount of thirty-five thousand dollars to the American Stores Company."

The point here involved might well be rested on what has already been stated, although further facts hereinafter stated under (2) add support to our conclusion that the $170,000 paid by the Dairy Company to the Stores Company for advertising was properly included by the taxing authorities in the base upon which the taxpayer's income tax was computed.

From the facts stated under (2) and those above stated it appears that the so-called advertising expenses here involved were not in any sense advertising expenses of the Dairy Company. They were neither incurred by the Dairy Company nor paid by that company. The Dairy Company did not authorize or direct the advertising. It had nothing to say as to the extent of it or how or when or where it should be made, and the Dairy Company neither said nor did anything whatever in connection with it. There was no previous agreement by the Dairy Company to pay for the advertising or to contribute toward the cost of it to say nothing of contributing any specific sum or proportion of it. The Dairy Company was not under any obligation to pay for or contribute toward it. Under these circumstances the

advertising was neither necessary nor ordinary. A corporation does not ordinarily pay, nor is it necessary for it to pay or contribute toward an expense incurred and paid by another corporation which it had not previously authorized or agreed to contribute toward. The board was obviously correct in considering the advertising as not that of the Dairy Company, and the contribution as neither a necessary nor ordinary expense of the Dairy Company. Moreover, advertising expenses, to be deducted as an expense, must be reasonable in amount and must have been actually done. There is no evidence that the amount contributed by the Dairy Company was actually devoted to advertising by the Stores Company; no evidence as to the amount paid by the Stores Company for advertising; no evidence that the amount contributed by the Dairy Company bore any relation to the purposes for which the Dairy Company here seeks to justify its contributions; viz., as made to save the Dairy Company the expense of storing its accumulated product while awaiting shipping orders from the Stores Company, which accumulation, it claims, was caused by the Dairy Company's necessity to take all raw milk delivered to it in order to protect its milk supply. There is no evidence that these matters were considered by the Stores Company in determining the extent of its advertising or by the Dairy Company in determining the amount of its contributions. It is plain, as the board found, that the payment operated to decrease the price the Stores Company paid the Dairy Company for its product, and reduced it approximately ten cents per case, the approximate amount at which unadvertised evaporated milk sold on the market below the price at which the advertised brands sold. The amount contributed was in effect a reduction of the price received by the Dairy Company for its product. As said by the board in its opinion: "It [turning over the advertising allowance] was in effect reducing its selling price to the parent [Stores Company] and furnishing it with price concessions."

That the purpose of the contribution was to save expense of storing the accumulation of the Dairy Company's product made necessary by its taking all milk offered to it is strongly negatived by the fact that during 1937, an intermediate year of the four years covered by the audit when the Dairy Company's income was least and the claimed occasion for advertising therefore greatest, it made no contribution at all toward the Stores Company's advertising and when its income was greatest its contribution was greatest. When the greatest need, if any, for advertising existed the Dairy Company did not contribute at all, and when the need was least the Dairy Company contributed most. The contributions toward advertising were made only when the gross income of the Dairy Company was such as to make it most desirable to make an expense charge for advertising to lessen the showing of net income and thereby evade a large part of the just income tax demands of the state. One is presumed to have intended the natural result of his acts. This presumption must be overcome or the presumption governs. Actions often speak more truly than words. The board was justified in considering the contributions in effect a price adjustment and in stating:

"There is sufficient evidence in the record to warrant the opinion that the differential in price of twenty-five cents per case constituted a broad enough concession in price to the parent to permit it to carry on a safe, competitive business, and to insure a ready market for the petitioner's products. Thus, additional price concessions allowed by means of 'advertising' contributions can only be considered as evidence of a plan adopted by the subsidiary to divert income to its parent."

The income of the Dairy Company was just as effectively "drained off," to use an expression used in tax-evasion cases under the statute involved, by making the contributions to the Stores Company's advertising cost as it would have

been done by charging ten cents per case less than the fair price at which the board found the Dairy Company's product was sold to the Stores Company.

We have no quarrel with the proposition that expenses of advertising may be and usually are a proper deduction from gross earnings of a business to get the net earnings which form the base for computation of the income tax attributable to that business. But under the Wisconsin statute, sec. 71.03 (2), such expenses to be so deductible must be "ordinary and necessary." Advertising expenses paid by a corporation are neither when the advertising cannot result in any benefit or advantage to the corporation, and no benefit could result to the Dairy Company from the advertising done by the Stores Company under the instant Dairy Company's corporate setup and stock ownership and the purpose which such setup and ownership were intended to serve and the practice as to disposition and use of the Dairy Company product which was contemplated and followed to effect that purpose. Under that setup and ownership the quantity of the Dairy Company's output was controlled by the Stores Company and the entire output was to be taken over by that company and the income of the Dairy Company was fixed by those factors. If the taking over of the output be considered a sale the sale was made before the advertising was done by the Stores Company and there was no previous agreement by the Dairy Company to reimburse the Stores Company or pay the Stores Company any part of the cost. It is a fair inference from the facts stated and letters of Mr. Bingham, the manager of the Dairy Company, to that company that the payments were made with a view to evade a large part of the Dairy Company's tax obligation.

(2) The appellant is correct in its hypothesis that when business by a foreign corporation is due in part to business conducted within the state and in part to business conducted without, in computing its income tax the tax should be pro-

rated between the inside and outside business. This is conceded and there is no need to cite statutes in support of it. But the appellant is incorrect in its conclusion that its income is due in part to outside business.

The taxing authorities held that the income of the Dairy Company was derived wholly from business transacted within the state. All the evidence, and there is no dispute as to the evidentiary facts, should be considered in determining whether that holding is sustained. Additional facts on which the taxing authorities in part based their holding may be summarized as follows:

The plant at Neillsville was owned by an Illinois corporation, herein referred to as "the Oatman Company," when it was purchased by the Stores Company. That company had no corporate connection with the Stores Company. That company operated another condensary located at Owen, Wisconsin. Both plants manufactured evaporated milk. The Oatman Company was managed by C. H. Bingham, who resided at Dundee, Illinois, where the Oatman Company's principal office was located and its business offices, records, and bacterial and chemical laboratory were located. All its manufacturing was done at the Neillsville and Owen plants. Bingham sold the product of both plants to whomever he wished and could. The Stores Company began buying from Bingham in 1919 and thereafter bought the evaporated milk for sale in its stores principally from the Oatman, Pet, Borden, and Carnation Companies. In 1928 when the Stores Company formed the Dairy Company it was buying nearly all of the output of the Neillsville plant. It then concluded to acquire that plant and the use of its facilities at Dundee, and to organize them into a subsidiary corporation so as to be able to control its output and assure to itself a steady supply of evaporated milk for sale in its stores. It therefore made the purchase and organized the Dairy Company as above stated. The Stores Company

and the Dairy Company have identical officers and directors except that Bingham who is the vice-president and treasurer of the Dairy Company is not an officer or director of the Stores Company. Retention of Bingham in the same capacity that he served the Oatman Company was a condition of the purchase of the Neillsville plant. After the organization of the Dairy Company he managed and served that company precisely as he had managed and served the Oatman Company and he continued so to manage and serve the Oatman Company which continued to operate the Owen plant and to use the Dundee offices and facilities the same as the Dairy Company used them. Things continued as theretofore. Bingham fixed the price at which the Stores Company took the Dairy Company's output in the same manner that he had theretofore fixed the sale price of the Oatman Company product, viz., at twenty-five cents per case less than the advertised brands were procurable for in the market. All orders for shipping milk were sent by the Stores Company to Dundee and from there forwarded to Neillsville and the shipping was there done according to the orders to the warehouses of the Stores Company or train tracks where the Stores Company's stores are located. The Dairy Company had no warehouse and no considerable storage space at Neillsville and none at Dundee. All invoices and bills are made at Dundee and payments for the goods shipped at Neillsville are made there. The Dairy Company does its banking with a Chicago bank and checks for payment of the raw milk delivered are drawn at Dundee and sent to Neillsville for delivery. So as to the pay roll. The Dairy Company had four employees at Dundee and about forty at Neillsville. Supplies of containers, labels, and blank invoices and shipping bills are procured by Bingham mostly from Chicago concerns with whom he has long done business and sent direct to Neillsville. The Dairy Company has no sales force or sales organization and pays

no brokerage fee for sales. There never has been any formal acceptance of the orders for shipment either at Dundee or Neillsville. Obviously everything done by or for the Dairy Company at Dundee might have been done at Neillsville, and might as well and as conveniently have been done there as at Dundee, except for the fact that Bingham resides at Dundee. Obviously Bingham's residence there operates greatly to his own convenience and advantage as it enables him to manage two plants and concerns instead of one. Were the things done and facilities kept at Dundee done and kept in Wisconsin it would not be contended that the Dairy Company's income was not derived from business transacted in Wisconsin. That the Dairy Company, in order to procure Bingham's services, saw fit to allow him to continue to reside at Dundee and to maintain there the facilities that it did should not in reason and cannot operate to evade or reduce its income tax liability. Otherwise a foreign manufacturing corporation having its plant at Beloit on the north side of a street on the state line may maintain a business office across the street in Illinois and thereby evade taxation by Wisconsin of the income derived from the operation of its plant.

That the income of the Dairy Company was wholly attributable to its manufacturing business done in Wisconsin seems too plain to require discussion. The mere keeping of the books and doing "paper work" incidental to the disposition of its product outside the state, or going outside the state to buy supplies or even to make sales of its product does not affect the source of its income. No more would keeping an office outside the state affect the source of its income. The principal place of the Dairy Company's business—its manufacturing plant—is within the state. Keeping branch offices outside the state to which the product is sent and from which it is sold does not affect the source of the income of a domestic manufacturing corporation.

*United States Glue Co. v. Oak Creek,* 161 Wis. 211, 153 N. W. 241. When that case was decided the tax on income of residents of the state was limited, as it is now, to "income as is derived from business transacted and property located within the state." Sub. 3, sec. 1087*m*—2, Stats. 1911; sec. 71.02 (3) (d), Stats. 1943. No more can it affect the source of income, under the facts here existing, in case of a foreign corporation licensed to do business in Wisconsin. If Bingham, the general manager, lived at Neillsville and went to Chicago or elsewhere outside the state to buy shipping and office supplies or even to effect sales of the product of the Dairy Company's plant, no one would claim that its income was not wholly attributable to business done in Wisconsin. No more can such claim be made simply because he lives at Dundee and there does or goes from there to do company business.

As matter of common sense the entire income of the Dairy Company is derived from the business of manufacturing evaporated milk at Neillsville, and is thus derived from business transacted within this state and is taxable under the statutes below cited.

Sec. 71.01, Stats., so far as here material, reads: "There shall be assessed, levied, collected and paid a tax . . . by every nonresident of the state, upon such income as is derived from . . . business transacted within the state."

Sec. 71.02 (3) (c), Stats., provides that for the purposes of taxation income from a manufacturing business not requiring apportionment because done in part within and part without the state "shall follow the situs of the business from which derived." Here the Dairy Company did no manufacturing business without the state.

Sec. 71.02 (3) (e), Stats., provides that a foreign corporation whose principal business is carried on in the state shall be deemed a resident of the state for taxation purposes as if it were incorporated within the state, notwithstanding

its domicile is without the state. The principal business of the Dairy Company was manifestly carried on in Wisconsin.

*By the Court.*—The judgment of the circuit court is affirmed.