ROBERTS, Appellant, vs. SAUKVILLE CANNING COMPANY, Respondent.*

*January 14—February 25, 1947.*

* Motion for rehearing denied, with $25 costs, on May 13, 1947.

114

115

For the appellant there were briefs by *Shaw, Muskat & Paulsen,* attorneys, and *Van B. Wake* of counsel, all of Milwaukee, and oral argument by *Mr. Wake.*

*Walter D. Corrigan, Sr.,* and *Morris Karon,* both of Milwaukee, for the respondent.

FAIRCHILD, J.   A claim of conspiracy is a challenging allegation, but in a civil action unless the conspiracy is established by clear and convincing evidence and some act pursuant to a formed conspiracy causing damage is proven, no cause of action exists.   11 Am. Jur., Conspiracy, p. 577, sec. 45. The defendant has attempted to maintain the cause set forth in its counterclaim.   The circuit court, under testimony to be referred to, ruled that Roberts, the plaintiff, "instigated and participated" in conduct on the part of directors of the Saukville Canning Company (Pugh, Gross, and Babcock) which amounted to a breach of "their fiduciary duties and obligations to the Saukville Company and its stockholders . . . and wrongfully and unlawfully profited thereby at the expense and to the detriment and loss of the Saukville Company and its stockholders. . . ."

The first point to be considered is whether a conspiracy existed in which Roberts participated with Pugh, Gross, and Babcock and under which the Saukville Company was imposed upon.   Upon this point attention must be paid to the financial history of the company and its dealings with the Wilclara Investment Company, of which Pugh and Gross were also directors.

Prior to 1939, the defendant had been in financial difficulties.   John W. Gross, then and until his death in 1941, was

president and a director of defendant. He was also during that time the secretary and treasurer of the Wilclara Investment Company, of which his wife was the president, the two holding practically all of the common stock. John W. Gross and the Wilclara Investment Company had advanced sums of money to the defendant over a protracted period of time. In 1939 these loans, amounting to $57,285, exclusive of interest, were reduced to judgment. On February 21, 1939, with the unanimous approval of the stockholders, a plan was adopted for the refinancing of the Canning Company, as appears in the preceding statement of facts. Pursuant to its terms, settlement was made with the creditors, the general creditors receiving fifty per cent of their claims and the growers receiving eighty per cent of theirs, and John W. Gross, by borrowing on his own credit, advanced an additional $20,000 to the company. This made defendant's total indebtedness $77,285. On March 27, 1939, the defendant executed a note and mortgage of $30,000 to John W. Gross and a second note and mortgage in the amount of $47,285 to the Wilclara Investment Company. These notes were to be due in three years. The first note and mortgage were subsequently, on September 9, 1941, assigned to the Wilclara Investment Company.

When the notes and mortgages were issued an agreement of employment and management was made between the defendant and John W. Gross. By the terms of this agreement Gross was given complete control of the Saukville Canning Company either for five years or until the notes were paid in full, whichever event should first occur. It was agreed that as long as the mortgage indebtedness remained unpaid all profits from the operation of the company should be applied toward the payment of such indebtedness as Gross should direct.

The Canning Company's financial problems were not solved by the 1939 arrangement with Gross. During the calendar year of 1939 the company sustained a net loss of $10,326.28

and during 1940 a net loss of $22,728.14. By the end of 1940 the total working capital of $18,000 on hand at the beginning of that year had been completely wiped out and current liabilities exceeded the total current assets by more than $6,000.

On February 21, 1941, John W. Gross died. Later his son, George Gross, was elected a director of the defendant company, representing his father's stock interests. Upon the death of John W. Gross, Mr. Joseph U. Lademan, a banker and a relative of John W. Gross, became a director of Wilclara Investment Company. In February, 1942, he became secretary-treasurer. Mrs. William Harold Pugh, a sister of John W. Gross, inherited considerable stock in the Investment Company and her husband was asked to assist in its affairs. Clara Gross, the widow, and George Gross, the son of the deceased, were the remaining shareholders in Wilclara after the death of John W. Gross.

In following up Wilclara's interests, Lademan, who favored closing or liquidating Wilclara, asked Pugh to look over the Saukville Canning Company. Pugh was elected to the board of directors of that company in 1941. Although Pugh concluded from an audit made when he was elected to the Saukville board that the company was bankrupt, he made arrangements for the continued operation of the plant, including a personal loan to the Canning Company, which was later repaid.

During the later part of 1941 and 1942 both Pugh and Lademan informed persons connected with the Canning Company that Wilclara was interested in disposing of the mortgages. Lademan discussed the matter with Mr. Coleman, president of the defendant, in 1942, telling him that if he could raise the full amount of the first note and mortgage, Wilclara would make a substantial reduction on the second. Coleman later reported it would be impossible to raise that much money.

There is testimony indicating that this same matter was mentioned by Pugh to other directors of the Saukville Canning Company between the time Pugh became a director and December, 1943. Pugh told the other directors of Saukville that Wilclara would take par for the first note and mortgage and $10,000 for the second. Again Coleman said the money could not be raised.

In August of 1943, the plaintiff, E. C. Roberts, who was already interested in a canning plant at Leroy, Illinois, and one at Monroe, Ohio, heard through a food broker that the Saukville Canning plant was for sale, and that Mr. Pugh could give further information. Sometime between August and October of 1943, Roberts consulted Pugh about the prospects of purchasing the plant. Before this, Roberts had been unknown to Pugh and to the others connected with Saukville and Wilclara. Pugh told Roberts that it would be necessary to purchase the notes and mortgages owned by Wilclara, and he offered them to Roberts for $60,000. The notes had then been due since March 27, 1942, and the interest on both notes was then delinquent. Roberts inquired as to how long it would take to foreclose the mortgages in the event he purchased them, and Pugh, after making inquiry of a Racine attorney, related the attorney's advice to Roberts, and that was that Roberts, if he purchased the mortgages, could get a substantial payment thereon from the mortgagor, foreclose on the mortgage, have a receiver appointed, and get an immediate sale if there was no opposition from the company. Mr. Roberts conferred with Mr. Hodgson, an attorney for the Continental Can Company, with a view toward getting assistance in financing the purchase. About this same time the president of Saukville had indicated to Mr. Pugh that the Canning Company would make a substantial payment on the mortgages.

On November 18, 1943, Pugh wrote a letter to Roberts, reiterating Wilclara's offer to sell the mortgages to him for

$60,000, and repeating their attorney's suggestion for the quickest way to obtain possession of the company. The letter concluded with these sentences: "An immediate sale could be held provided there was no opposition from the company and possession be secured promptly thereafter. It is believed that there will be no opposition from the company."

On December 10, 1943, there was a meeting of the board of directors of the Saukville Canning Company. The minutes of that meeting show that Wilclara's desire to sell the notes and mortgages was discussed. Pugh made no specific mention at that December 10th meeting that the mortgages had been offered to Roberts for $60,000. He testified that he did tell the directors the mortgages had been offered for sale to another but he did not mention either Roberts' name or the amount. The Canning Company had made net profits of $37,000 in 1942 and $23,000 in 1943.

On December 20, 1943, Roberts tendered his personal check of $1,000 to Pugh as a down payment on the purchase price of the mortgages. Sometime before January 27, 1944, Roberts conferred with Mr. Amos Babcock, who was the field manager and a director of Saukville, about his managing the plant if Roberts acquired it. Babcock indicated he would be interested. On January 27, 1944, Roberts, his attorney, Mr. Hodgson, Mr. Pugh, and an attorney representing Wilclara met to close the sale of the mortgages at the Second-ward office of the First Wisconsin National Bank of Milwaukee. At the same time, but in separate rooms of the bank, the stockholders of Wilclara were meeting to authorize the sale of the notes and mortgages to Roberts, and the directors of Saukville were meeting to consider the proposition of making a payment upon the notes and mortgages. At the first of these three meetings, a $60,000 check, procured by Hodgson for Roberts through the Continental Can Company, was turned over to Wilclara's attorney in return for the documents assigning the notes and mortgages. Along with the notes and mortgages Roberts got

the shares of stock in Saukville that had formerly been held by Pugh and Gross. Roberts gave his personal unsecured note for $60,000 to Hodgson for the loan.

At the Saukville directors' meeting held simultaneously, Pugh announced that Wilclara had sold its notes and mortgages to Roberts. Coleman, the president, said the corporation was in a position to make a substantial payment on the mortgages. After an analysis of the balance sheet, the sum of $30,000 was considered. Upon discussion of the matter and upon Roberts' agreement to waive the defaulted interest, amounting to several hundred dollars on the first note, it was moved that $30,000 be paid by the Saukville Canning Company to Roberts for the discharge of the first mortgage. One of the directors, Mr. William Schmit, objected to making that payment to Roberts, but the motion was passed with Gross, Babcock, and Pugh voting for it, Schmit voting against it, and Coleman, the presiding officer, not voting.

A check was then delivered to Roberts who executed a release and satisfaction of the first note and mortgage and turned them over to the Saukville Canning Company. The $30,000 check he indorsed and gave to Hodgson as payment on the loan Hodgson had arranged.

At the meeting of January 27, 1944, and afterwards, Schmit claimed that paying the $30,000 to Roberts crippled the Saukville Canning Company by leaving it with insufficient funds for operating the following season. After the check had been written, the Canning Company was not without resources. However, the company itself took no action to get a loan for operating expenses immediately after January 27, 1944. Mr. Schmit did talk to a banker about such a loan sometime between January 27 and March 15, 1944, and was told a loan could be negotiated.

On February 18, 1944, a special meeting of the stockholders of Saukville was held and an offer by Roberts to satisfy and discharge the remaining note and mortgage in consideration

for a release by the stockholders of the corporation's equity of redemption was rejected. Soon after that, on February 28, 1944, Roberts began a foreclosure action.

At a March 15, 1944, meeting the stockholders of Saukville authorized the issuance of preferred stock to raise the amount necessary for operating the business, but nothing further was done by Schmit or Saukville in the matter of raising money.

The evidence must be analyzed in the light of the rule requiring clear and convincing proof of wilful, wrongful, and unlawful acts. The question is earnestly raised as to whether Pugh and Gross violated a fiduciary duty owed to the stockholders of Saukville. To substantiate their contention that Saukville's controlling directors did breach their fiduciary duty, respondents cite cases which hold that any action on the part of directors which impairs the corporate rights or tends to destroy the corporation itself, any action which is to the detriment of the stockholders, is a breach of trust on the part of the participating directors. True, two of the directors of the debtor Saukville Canning Company were also directors of the creditor Wilclara Investment Company. That they were directors in both companies does not prevent them from protecting the just interests of each. Common directors of a debtor corporation and a creditor one are not to be prevented from enforcing the contract obligations of one to the other. Being the holder of overdue notes secured by mortgages, the Wilclara Investment Company could have begun foreclosure proceedings. 7 R. C. L., Corporations, p. 461, sec. 444; 33 L. R. A. 788 ff; 13 Am. Jur., Corporations, p. 986, sec. 1042; *Glenwood Manufacturing Co. v. Syme,* 109 Wis. 355, 85 N. W. 432. Being the holder of those notes and mortgages it could also convey them, as it did, to Roberts. It was then Roberts' legal right to enforce payment of that debt.

Contracts between corporations having identical officers are not void, but are voidable if either corporation has been imposed upon. *State ex rel. Shinners v. Grossman,* 213 Wis.

135, 138, 250 N. W. 832. The evidence here does not sustain a finding that the Saukville Canning Company was imposed upon. It is contended that the directors of Wilclara, who were also directors of Saukville, took unfair advantage of the stockholders of Saukville in voting, as directors of Saukville, to pay $30,000 to Roberts in discharge of the first mortgage. This payment is claimed not only to have been ill-advised, but because of it the claim is made that Roberts at least tacitly consented to the object of a conspiracy to wilfully and maliciously injure the business of the Saukville Company and acquiesced in the acts of the other conspirators. The findings below with relation to this claim are against the great weight and clear preponderance of the evidence. It would be strange to conclude that facilitating the payment of a just debt by a debtor corporation is taking unfair advantage of its stockholders. It is not clear whether the Saukville Company was solvent or not at the time the $30,000 was paid to Roberts. If the company was insolvent, its directors did not fail in a fiduciary duty to the creditors. By voting to pay off the first note and mortgage they were discharging a duty owed a creditor, and since all other creditors were subsequently paid in full, the payment to Roberts could not be considered in any event preferential.

On the other hand, if the Canning Company was solvent at the time, the action taken by the directors in paying off the first note to Roberts did not necessarily make it impossible for the company to operate. The evidence indicates that it might have been possible for the company to get another loan or to raise the money through an issuance of preferred stock if it had taken timely steps to do so. Even now if the stockholders of Saukville desire to and are financially able to regain control of the factory, there is still an opportunity for them to do so. Theirs is still the legal title to the canning factory; theirs the right to eventually obtain control by discharging their debt.

In considering the claim that Saukville's directors should not have paid off the first note and mortgage without the con-

sent of the stockholders, it is important to remember that the business of a corporation is committed to its officers and directors and their actions are not to be overruled if they are consistent with the exercise of honest discretion. *Steven v. Hale-Haas Corp.* 249 Wis. 205, 221, 23 N. W. (2d) 768. When the notes here involved were first issued the stockholders unanimously gave to John W. Gross virtual control of the Canning Company, including the right to pay off the indebtedness as he saw fit. He was to have that right until the notes were paid or until five years had elapsed, depending on which event occurred first. Regardless of the effectiveness of the agreement, it is important evidence to be given weight on the question of good faith. Pugh and George Gross succeeded to the position of John W. Gross upon the latter's death. Apparently no effort had been made by the stockholders after John W. Gross' death to minimize the control previously given to the holder of those notes and mortgages.

Respondent places considerable weight on the letter of November 18, 1943, written by Pugh to Roberts, claiming that it indicates Pugh's breach of fiduciary duty. In that letter Pugh did say that an "attorney suggested that the quickest way to obtain possession of the company would be to get a substantial payment from the Saukville Company on the mortgages then to foreclose . . . ." Even if that statement were his own and not merely the repetition of another's advice, there is testimony indicating that he would have been justified in suggesting that Saukville was ready to make a "substantial payment." Some time before that the president of Saukville had told Pugh that Saukville was interested in making such a payment. It is significant that he gave no indication of what the "substantial payment" might be.

The language of the November 18, 1943, letter most emphasized by the respondents is this : "It is believed that there will be no opposition from the company." It is argued that this sentence indicates that Pugh would use his influence to

see that no opposition did come from the company. However, it is to be remembered that these notes were long overdue and that both Lademan and Pugh had offered to satisfy them and discharge the mortgages if Coleman and others interested in the Saukville Company could raise $40,000. Since Coleman had twice indicated that that money could not be raised, and since the directors of Saukville during that time knew that Wilclara was interested in selling the notes and mortgages and yet made no effort to avail themselves of the opportunity, Pugh was warranted in concluding the company would not oppose a sale. The evidence of the dealings between the corporations shows more of friendly consideration than imposition.

There might be some room for saying that if Pugh had announced at the December 10th meeting of the Saukville board of directors that Wilclara was offering the notes and mortgages for $60,000 to Roberts, who was interested in operating the plant, the Saukville Canning Company would have acted differently. Certainly Pugh was not bound to do more than he did. As a director of Wilclara Investment Company he was rightly interested in getting as much as possible for the notes and mortgages. He did tell the directors at their December 10th meeting that Wilclara had made an offer to sell the notes and mortgages to another. The other directors displayed no serious interest in purchasing or paying them. They took no steps at that time to protect Saukville's interest if that was to keep any and all others from getting the degree of control of Saukville which ownership of the notes and mortgages carried with it. They knew and had known for some time that Wilclara was interested in getting money due it by the payment of or sale of those notes and mortgages, and they knew or should have known of the rights at the disposal of the holder of those notes and mortgages to enforce those debts.

In view of these considerations the evidence does not sustain a finding that Pugh breached his trust. There is a lack of evidence to establish a plan to do anything further than

enable the Wilclara Investment Company to realize as much as it could on the indebtedness due it from Saukville. From a study of the evidence in a careful examination of the record we conclude that the findings of conspiracy are not supported; the proof does not clearly and convincingly show that Pugh and other directors of Saukville acted pursuant to a wrongful scheme to defraud Saukville's stockholders.

Neither does the evidence prove that Roberts was a party to a malicious plan or conspiracy, that he "instigated and participated" in conduct by which he "wrongfully and unlawfully profited." From the time he first approached the subject Roberts made it clear that he was interested in operating the Saukville Canning Company. He cannot be condemned for seeking to broaden his business interests. He was entitled to try to get operating control of that canning factory if he wanted to. Any honest steps he might take in that direction would be justified. Any fraudulent steps he might take would, of course, entitle the company to redress. An examination of the steps he did take does not reveal clear and convincing proof of fraud. Certainly there was nothing fraudulent about his open declaration that he wanted to buy the plant. He was told that the best way to get it was to buy the notes and mortgages. The fact that he was motivated in buying them by a desire to control the company rather than by a desire to hold the mortgages as an investment does not make a fraudulent scheme of his legitimate business purpose.

Most of the argument that Roberts' purchase was made pursuant to a wrongful scheme centers around the contention that he unfairly acquired the $30,000 payment from Saukville in discharge of the first note and mortgage. It is argued that he induced Babcock, one of Saukville's directors, to vote for that payment by offering him a better job. Babcock was already working for the company when Roberts asked if he would be interested in acting as superintendent if Roberts

should get control of the company. The record reveals no mention by Roberts of any increase in salary for Babcock. Neither was any mention made between them of a possible future payment by Saukville on its indebtedness.

The letter of November 18, 1943, from Pugh to Roberts, is neither strong enough nor definite enough in its wording to warrant a finding that Roberts bought the notes and mortgages in an effort to carry out a conspiracy. As has been pointed out, the facts justified Pugh's saying what he did in that letter. What the payment was to be Roberts did not know until the day he was on hand to deliver the $60,000 purchase price for the notes and mortgages to Wilclara. In paying Roberts the $30,000 the directors of Saukville were paying something on an indebtedness they were honestly obligated to pay. It is considered that the evidence does not support the trial court's finding that Roberts obtained the mortgage he is now trying to foreclose by a fraudulent scheme. He has become the owner of a note and mortgage. He has not obtained possession of the legal title and is in the throes of a foreclosure action which he is entitled to prosecute and from which the respondent can save itself if it is worth its while to do so.

This conclusion takes out of consideration the question of damages and election of remedies and requires returning the case to the circuit court to proceed with the foreclosure.

*By the Court.*—Judgment reversed. Cause remanded with directions to dismiss defendant's counterclaim, and for further proceedings in accordance with this opinion.