AMERICAN MOTORS CORPORATION, Appellant, v. DEPART-
MENT OF REVENUE, Respondent.

*No. 124. Argued June 3, 1974.—Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 300.)

338

340

For the appellant there were briefs by *Steven E. Keane, Joseph R. Barnett, Ronald L. Walter* and *Foley & Lardner,* all of Milwaukee, and oral argument by *Mr. Keane.*

For the respondent the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. The major issue here is whether the automobile sales by American Motors Corporation to American Motors Sales Corporation, for the four years involved, were Wisconsin sales under sec. 71.07 (2), Stats. 1969. The minor issue is whether the state, in the event of taxpayer refund, is entitled to offset an additional tax assessment for the year 1961 of $8,370.79, on which the statute of limitations has run. Since the statute involved in the refund claim has been substantially modified by the legislature,[1] the decision on the minor issue may have more precedential value than the ruling on the major issue. For we deal solely with the statute as it was before modification and as it applies to the sales occurring in 1961, 1962, 1963 and 1964.

*Situs of sales.* The statute involved, sec. 71.07 (2), Stats. 1969, provides for taxation of income of persons engaged in business within and without the state ". . . only on such income as is derived from business transacted and property located within the state. . . ." As to the taxation of sales, the only aspect of the business or manufacturing process here involved, par. (c) of the statute provides for taxation of ". . . the ratio of the total sales made through or by offices, agencies or branches located in Wisconsin during the income year . . . ." Additionally, the state administrative code provided that, ". . . Goods sold through a sales office located outside of the state without the intervention of any Wisconsin office, branch or agency

---

[1] *See:* Sec. 71.07 (2) (c), Stats. 1971, as created by ch. 125, sec. 373, Laws of 1971, and amended by ch. 90, sec. 352, Laws of 1973 (latter effective for 1974 tax year).

but shipped from a factory located in Wisconsin to a Wisconsin customer are not Wisconsin sales. . . ." [2] In the interpretation and application of the tax statute involved, both parties rely heavily upon two cases, and the circuit court agreed that they were dispositive of this case. One is the *Globe-Union Case;* [3] the other is the *Applied Power Case.* [4]

*Globe-Union Case.* On this appeal, the state appears to take appellant's position that the *Globe-Union* decision ". . . is controlling, even though it is not the latest case decided on the subject of this litigation. . . ." [5] The state relies upon this case for its conclusion that, in this state, ". . . the place where the major portion of sales activities take place [is] the controlling factor . . . ." [6] As to the taxability of sales income, the *Globe-Union* test is, as the trial court observed, whether or not the major portion of sales activity was put forth in Wisconsin. Globe-Union, like American Motors Corporation, was a unitary business. [7] Globe-Union was a Delaware corporation with its principal office in Milwaukee. American Motors Corporation is a Maryland corporation with its principal office in Michigan, and its factories in Wisconsin. Globe-Union manufactured car batteries in Milwaukee and in 12 other factories outside Wisconsin, which it sold to Sears pursuant to a long-term 75 percent require-

[2] 6 Wis. Adm. Code, TAX 2.42 (3). (Now 8 Wis. Adm. Code, TAX 2.42 (3).)

[3] *Globe-Union, Inc. v. Department of Taxation* (1963), 20 Wis. 2d 213, 121 N. W. 2d 894.

[4] *Applied Power Industries v. Department of Taxation* (1964), 25 Wis. 2d 219, 130 N. W. 2d 841.

[5] Respondent's Brief, page 13.

[6] Respondent's Brief, page 12.

[7] *See: W. R. Arthur & Co. v. Department of Taxation* (1962), 18 Wis. 2d 225, 230, 118 N. W. 2d 168, stating, ". . . A 'unitary' business is one which functions as a single unit; that is, it is not divided into a separate entity for each of the states in which it operates. . . ."

ments contract. Batteries were requisitioned by Sears as needed from the factory closest to the point of need.

In *Globe-Union*, the court held that the sales involved were Wisconsin sales because ". . . the participation of the Wisconsin office in the total sales picture was crucial. Compared to the sales activities which were performed outside of Wisconsin, what was done within Wisconsin was major and significant." [8] The decision went on to note that the basic contracts were executed by the Wisconsin office; the entire price structure was the product of activities at the Wisconsin office; cost determinations as well as engineering specifications were calculated in Wisconsin; payments were made in Wisconsin, and the books were kept at the home office in Wisconsin; competitive price negotiations took place in Wisconsin; and the renegotiation of billings were handled by the home office of Globe-Union in Wisconsin. [9] In the case of American Motors Corporation, basic contracts were executed in Michigan; the price structure was the product of activities in Michigan; cost determinations and price allowances were made in Michigan; payments were made in Michigan; books were kept in Michigan; the home office of American Motors Corporation was in Michigan, not Wisconsin. In fact, what was done at Globe-Union's principal office in Wisconsin corresponded to what was done at the American Motors Corporation home office in Michigan, and what was done at Globe-Union's out-of-state factories is analogous to what was done at American Motors factories in Wisconsin. As to sales activities, we see no American Motors counterpart to Globe-Union's centering all such activities and negotiations in its home office in Wisconsin. Under the *Globe-Union* test, it is clear that the major portion, in point of fact nearly all, of

[8] *Globe-Union, Inc. v. Department of Taxation, supra,* at page 220.

[9] *Id.* at pages 220, 221.

American Motors' sales activities were conducted in Michigan, not Wisconsin. The circuit court concurred in holding that the sales in the case at bar occurred in Michigan, but found the *Globe-Union* test and rationale not applicable.

*Applied Power Case.* The trial court felt that the situs of sales test of *Globe-Union* was abandoned in the *Applied Power Case* [10] in favor of an "actionable transaction" test with the sale occurring when and where a legal liability was created. In *Applied Power,* the facts were similar to those in *Globe-Union.* Applied Power was a Wisconsin corporation engaged in the manufacture and sale of hydraulic jacks in West Allis and Sheboygan in this state. Its principal or home office was located in West Allis. It contracted with warehouse corporations in New York and Los Angeles to lease storage space and authorized such corporations to sell therefrom for its account to distributors specified by Applied Power. Prices and credit limits were set by the taxpayer in Wisconsin. The warehouses sent shipping invoices to the home office in Wisconsin which then billed the distributor from data processing machines located in the home office in Wisconsin. Payments were usually made to the home office. In the significant considerations related to the sales factor, we do not see the *Applied Power* fact situation as analogous to the American Motors Corporation sales of automobiles. However, this court, in *Applied Power,* holding that sales in New York and Los Angeles were not Wisconsin sales, [11] did state, "The factor

---

[10] *Applied Power Industries v. Department of Taxation, supra.*

[11] *Id.* at page 227, stating, "In the case at bar, although the main office sets the prices, does the billing, and operates as a credit manager, no sale, no binding contract, no actionable transaction, exists until an order is placed with the warehousemen. The warehousemen fill an order if it comes within the limit set by the taxpayer at the price set by the taxpayer, but do not check with the taxpayer before entering into the contract. They are in effect agents of the taxpayer empowered to make sales in their respective states though limited in their authority."

distinguishing the *Globe-Union Case* from the case at bar is the absence here of overriding contracts negotiated in Wisconsin which were merely performed from time to time by deliveries from inventories located outside the state." [12] We see this as no more than a distinguishing of the fact situation in *Applied Power,* from the fact situation in *Globe-Union,* and not an abandonment of the general "major portion of sales effort" test of *Globe-Union.* The two cases can and do sleep in the same bed, although on different sides of it.

To provide a basis for applying the *Applied Power* holding that sales there occurred when the warehousemen filled an order, the trial court here was obliged to and did disregard the contract between American Motors Corporation and American Motors Sales Corporation. It did so for two reasons: (1) The contract did not specify that American Motors Sales Corporation must buy any particular quantity of automobiles; and (2) the contract between American Motors Corporation and American Motors Sales Corporation was not an arm's-length transaction. It is to be here noted that the state here has not sought to pierce the corporate identity or contend that the parent-subsidiary relationship between the manufacturing company and the sales company vitiates the contract between them. A contract between parent-subsidiary corporations, even with identical officers, is not void, but only voidable for fraud or unfairness. [13] There is here no claim or allegation of either fraud or unfairness in the relationship, so there is no basis in this record for striking down the contract between the two companies on these grounds. While the negotiation of a sales agreement between a parent and a subsidiary company may well in-

[12] *Id.* at page 227.

[13] *Gauger v. Hintz* (1952), 262 Wis. 333, 354, 355, 55 N. W. 2d 426, citing *Roberts v. Saukville Canning Co.* (1947), 250 Wis. 112, 122, 26 N. W. 2d 145; *Bergenthal v. Boynton Automobile Livery Co.* (1922), 179 Wis. 42, 49, 190 N. W. 901.

volve little sales activities in its negotiations, that fact does not warrant either invalidating or ignoring it.

Additionally, the trial court emphasized that the sales agreement between American Motors Corporation and American Motors Sales Corporation did not, as did the requirement contract in *Globe-Union*, require the sales company to purchase any particular number or percentage of automobiles. That is correct, but it does appear to us that the contract is a "best efforts" contract. The sales corporation is made responsible for "developing the market for motor vehicles and Manufacturer's parts and accessories."[14] The sales corporation is to "provide satisfactory sales performance."[15] It is also required by the contract to execute dealer franchise contracts.[16] We hold

[14] AMC-AMS contract provides: "1. The Manufacturer will sell to the Zone and the Zone will purchase motor vehicles and Manufacturer's parts and accessories under and in accordance with the terms and conditions hereof. Zone will be responsible for developing the market for motor vehicles and Manufacturer's parts and accessories in the following described areas: Continental United States, Hawaii and Alaska."

[15] AMC-AMS contract provides: "*Seventeen.* Zone shall properly develop the market in its designated area, provide satisfactory sales performance and render satisfactory service to owners therein. Zone's sales performance shall be evaluated on the basis of the relationship of Zone's sales of new motor vehicles to the sales of new motor vehicles made by other comparable Zones. Sales of motor vehicles by all Dealers and Zones in the national area may also be considered in such evaluation."

[16] Franchise contract provides: "*Sixteen.* Dealer shall assume the responsibility for developing sufficient sales volume of Manufacturer's products in Dealer's market area to meet the sales planning potential from time to time determined by the Zone and communicated to Dealer and of rendering satisfactory service to owners therein to justify Dealer's and Zone's investment in such market area, and thereby to obtain the market penetration to which the Manufacturer's products are entitled. Dealer's sales performance shall be evaluated on the basis of comparison of Dealer's sales of new motor vehicles to such sales planning potential. The evaluation shall be based on records and considerations generally accepted by the automobile industry."

the contract to require the sales company to use reasonable efforts, in fact, its best efforts, to accomplish the sales and develop the markets for the American Motors Corporation automobiles and products. With no attack made upon the validity of the contract by the state, we see no reason or basis here for holding the contract between American Motors Corporation and American Motors Sales Corporation, viewing its terms and reviewing this record, to be an invalid contract. We add only that an obvious reason for the state's not seeking to attack the contract here is that to do so successfully might well be a pyrrhic victory. The point at which the corporate veil would have to be pierced, it would appear, is the point where American Motors Sales Corporation submits car orders to the plant in Kenosha. Any such attempt to pierce, if successful, would result in the conclusion that orders are submitted by dealers to American Motors Sales Corporation zone offices as agents for American Motors Corporation. With 97 percent of such agents located outside of the state of Wisconsin, the tax consequences of waging and winning that battle would be slight.

*American Stores Case.* For the sake of completeness and since both parties discuss (and debate) the possible relatedness to the fact situation here before us of the *American Stores Dairy Company Case,*[17] we review the facts and holding of that case. The case involved the Dairy Company, a Delaware corporation wholly owned by the American Stores Company, also a Delaware corporation. The Dairy Company consisted of one milk condensary plant, located in Neillsville, Wisconsin. All of the products were sold to American Stores Company. The two companies had identical officers and, with one exception, the same directors. This court found that, to procure the services of the Dairy Company's vice-president, the company ". . . saw fit to allow him to continue

[17] *American Stores Dairy Co. v. Department of Taxation* (1945), 246 Wis. 396, 17 N. W. 2d 596.

to reside at Dundee [Illinois] and to maintain there the facilities that it did, . . ." and concluded that this fact ". . . cannot operate to evade or reduce its income tax liability. . . ." [18] The holding in the case was that ". . . the income of the Dairy Company was wholly attributable to its manufacturing business done in Wisconsin, . . ." and that ". . . [t]he mere keeping of the books and doing 'paper work' incidental to the disposition of its product outside the state, or going outside the state to buy supplies or even to make sales of its product does not affect the source of its income. . . ." [19] The decision makes clear that ". . . a foreign manufacturing corporation having its plant at Beloit on the north side of a street on the state line may [not] maintain a business office across the street in Illinois and thereby evade taxation by Wisconsin of the income derived from the operation of its plant." [20] For our purposes here, it is enough to note that the issue of only nonsubstantial services being performed outside of this state or of a business office being located out of the state to evade Wisconsin taxes is not raised in the case before us. No issue is raised as to whether American Motors Corporation operates or transacts its business in this state or out of it. No issue is raised as to the propriety of the main office and its multiple managerial functions involved being located in Detroit, Michigan. Going no further, it is enough here to hold that the issue on which the *American Stores Dairy Company Case* rests was not here raised at all.

*Tax refund.* We hold that American Motors Corporation is entitled to an income tax refund in the amount of $3,106,998 for the fiscal years of 1961, 1962, 1963 and 1964. With tax liability as to sales limited by sec. 71.07 (2) (c), Stats. 1969, to ". . . the ratio of the total sales made through or by offices, agencies or branches located in Wisconsin during the income year to the total net sales

[18] *Id.* at page 407.
[19] *Id.* at page 407.
[20] *Id.* at page 407.

made everywhere during said income year," we hold that the sales here involved for the years here involved were made in the state of Michigan, not in the state of Wisconsin.

*Refund offset.* With the American Motors Corporation's claim to tax refund granted, we hold that the state has the right to deduct therefrom an assessment of $8,370.79, owed by American Motors Corporation for the 1961 tax year but barred by the four-year statute of limitations.[21] The cases on the point of law involved appear to fall into two categories. The first are cases in which the taxpayer timely sues for a refund, and the taxing authority attempts to counter such claim with a deficiency barred by a statute of limitations. In such situation, the majority rule appears to be that an application for refund of income tax can be offset by an additional assessment even though the latter was barred by a statute of limitations.[22] The second category of cases deals with the situation where the taxing authority timely makes an additional assessment on the taxpayer, who attempts to counter it with a refund claim barred by a statute of limitations. Here the weight of authority supports allowing such taxpayer refund claim only to the extent of the amount of the assessment under the doctrine of recoupment, whereby cross-demands arising out of the same transaction are allowed to compensate one another

[21] Sec. 71.11 (21) (bm), Stats. *See also:* sec. 71.10 (10) (bn), Stats., relating to provisions for refunds and credits.

[22] *See: Lewis v. Reynolds* (1932), 284 U. S. 281, 283, 52 Sup. Ct. 145, 76 L. Ed. 293, the court holding: ". . . Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded." *See also: Hicks v. United States* (10th Cir. 1973), 486 Fed. 2d 325, 329; *Globe Gazette Printing Co. v. United States* (Ct. Cl. 1936), 13 Fed. Supp. 422, 425; *Pope Estate Co. v. Johnson* (1941), 43 Cal. App. 2d 170, 173, 110 Pac. 2d 481. *See generally:* Annot. (1950), *Taxes—Setoff of Barred Claims,* 12 A. L. R. 2d 815.

and the balance of the initial claim only may be recovered.[23] The differing result derives from the first type of action, *i.e.*, that of the taxpayer for refund, with the taxing authority countering with an assessment, being considered to be an action for money had and received, while the second type of action, *i.e.*, the claim of the taxing authority, countered by the taxpayer's refund claim, is considered from the latter's viewpoint to be a recoupment. We see no merit to the result of having different tests apply, depending on whether the government or the taxpayer sues first.

We see the difficulty and the debate on this point as arising out of the phrase, "same transaction," to which recoupment has traditionally been limited.[24] It is true that recoupment has never been "thought to allow one transaction to be offset against another," [25] but the question remains what is the "same transaction" involved in claims for refunds or additional assessments in income tax cases for a single tax period. There is support for the narrower or stricter definition of "same transaction" as involving only a particular item on a tax return or

---

[23] *See: Bull v. United States* (1935), 295 U. S. 247, 262, 55 Sup. Ct. 695, 79 L. Ed. 1421; *Richmond v. Telephone Co.* (1965), 205 Va. 919, 925, 926, 140 S. E. 2d 683; *Matter of National Cash Register Co. v. Joseph* (1949), 299 N. Y. 200, 203, 86 N. E. 2d 561. *See also: Peterson v. Feyereisen* (1931), 203 Wis. 294, 234 N. W. 496, where this court, in a nontax case, accepted the proposition that a "stale" claim may be used for recoupment.

[24] *See: Independent Iron Works v. State Board of Equalization* (1959), 167 Cal. App. 2d 318, 324–328, 334 Pac. 2d 236.

[25] *Rothensies v. Electric Battery Co.* (1946), 329 U. S. 296, 299, 67 Sup. Ct. 271, 91 L. Ed. 296, stating that, ". . . The essence of the doctrine of recoupment is stated in the *Bull* case: 'recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded.' 295 U. S. 247, 262. It has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole."

single event or transaction during the tax period.[26] This limited or narrow definition of a "single transaction" in an income tax situation was rejected by an eastern court in the *National Cash Register Co. Case.*[27] There the New York State court adopted a broader definition, holding that the entire year or tax period constituted the "transaction" involved. The result of this broader test or definition is that either the state or the taxpayer can counter with a "stale" claim, meaning one barred by the statute of limitations, so long as the same year or income tax period is involved. We see both equity and equality of treatment of the contending parties served by the *National Cash Register Company Case* approach. Adopting the definition of "same transaction" as meaning any transaction in the tax period involved in either a claim by the taxpayer for refund or by the state for additional assessment, as we do, leaves no basis for disputing the right of the state here to recovery of the $8,370.79, owed by American Motors Corporation for the 1961 tax return but barred by the applicable statute of limitations.

*By the Court.*—Judgment reversed and cause remanded with directions that appellant's refund application be

---

[26] *See: Boyle v. United States* (3d Cir. 1967), 380 Fed. 2d 973, 974, 975. *See also: Richmond v. Telephone Co., supra,* at pages 925, 926.

[27] *Matter of National Cash Register Co. v. Joseph* (1949), 299 N. Y. 200, 203, 86 N. E. 2d 561, the court on this point stating: ". . . Of course, such a process does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole. [Citations omitted.]

"Here the city reopened the matter of the sales tax liability of the vendor for the period September 1, 1935, to December 31, 1940, and assessed a tax deficiency against it for that period. The vendor, as we think, was thereby given an equitable right to plead against the city a recoupment claim for taxes of the same type which the vendor (as it alleges) had erroneously paid to the comptroller in the same period."

granted, less the assessment made against it for the 1961 fiscal year.