DEPARTMENT OF TAXATION, Appellant, vs. ANSUL CHEMICAL COMPANY, Respondent.

*October 12—November 6, 1951.*

*Motion for rehearing denied, without costs, on January 8, 1952.

For the appellant there were briefs by the *Attorney General* and *Harold H. Persons* and *E. Weston Wood,* assistant attorneys general, and oral argument by *Mr. Persons* and *Mr. Wood.*

For the respondent there was a brief by *Toebaas, Hart, Kraege & Jackman* of Madison, and *Eastman, Rose & Faller* of Marinette, and oral argument by *W. L. Jackman.*

BROWN, J.   The department's assessment and a portion of its argument was made upon the ground that Ansul had

made sales the income from which was apportionable to Wisconsin and controlled by sec. 71.02 (3) (d) 3, Stats. 1943, but at the hearing before the board of tax appeals and its subsequent appeals it has attempted to sustain and increase the amount of its assessment upon a second theory, which is that Ansul made sales not for itself but as an agent for Kinetic. In the department's later view the transaction is between the customer and Kinetic, through the solicitation of Ansul, and the income in question is not profit on a sale but is a commission which, either as compensation for personal services or as miscellaneous income, in its entirety follows the residence of the recipient for income-tax purposes, under the provisions of sec. 71.02 (3) (c), Stats. 1943.

It may be said at once that there is much evidence to support the department's theory. Ansul and Kinetic had a contract which designated Ansul as a sales agent for Freon. The other provisions of the contract are consistent with that relationship and throughout the period under discussion all invoices and acknowledgments made out by Kinetic refer to Ansul as agent-trustee. The contract also provides that Kinetic was to bill the customer and, if necessary, Ansul was to assist in making the collection. If the customer did not pay Kinetic promptly Kinetic might charge the shipment back to Ansul and withhold the amount of the bill from Ansul's other commissions until Kinetic had recovered its loss, whereupon it would assign the delinquent account to Ansul. This contractual procedure was abandoned, however, and Ansul contends that it became a vendor on its own account by ordering Freon in its own name and paying for it with its own funds so that Kinetic's sole concern about the transaction was to ship as Ansul directed.

This is clearly a matter where either conclusion finds a basis in the record but ours is the one reached by the board of tax appeals and by the circuit court. Notwithstanding the terms of the contract nor what the parties could or might

have done under it, in actual practice, as the record shows, the customer directed his order to Ansul at Marinette and received a confirmation that Ansul at Marinette had sold him a quantity of Freon. There is no reference to Kinetic in this correspondence. Then, within thirty days from the time when Kinetic made the shipment, as Ansul directed, Kinetic billed Ansul for all such shipments during the period and Ansul remitted to Kinetic whether or not the customer had then paid the bill which Ansul had sent him in Ansul's own name. About one half of the money sent by Ansul to Kinetic was from Ansul's own treasury, before Ansul had received anything from the customer. We conclude that Ansul bought and paid for Freon and the sale to the consumer was by this taxpayer and not by Kinetic.

The strength of Ansul's evidence in establishing its position as a vendor, however, defeats its contention that it was not transacting business in Wisconsin in respect to such sales. It relies on *United States Glue Co. v. Oak Creek* (1915), 161 Wis. 211, 153 N. W. 241, in which we said, page 218, that "The income derived from goods which were produced and purchased outside of the state and shipped, either directly or by way of plaintiff's factory at Carrollville [Wis.], to plaintiff's branch houses and thence sold and delivered to customers without the state, is clearly a separable class of plaintiff's business. Such business is transacted and located without the state, excepting incidental management from and accounting for the result thereof to plaintiff's principal office at Carrollville. . . ." Ansul's activities are much more than those of the home office in the *Glue Co. Case, supra,* where the taxpayer owned stocks of goods in branch offices in other states and the customer's order was there accepted and filled without the intervention of the home office. The Glue Company's Wisconsin office gave incidental management to the branch's business and there was accounting by the branch to it, but the home office did not participate in the sales

which produced the income. Not so, in the instant case. The activities of the Wisconsin office which Ansul relies on to show it was a vendor go far beyond the limits of the incidental management of a branch's business. They are an important part of Ansul's sale to the customer and must certainly be construed as business transacted in Wisconsin, through the Marinette office, and productive of the income in question. The amount of such income, then, apportionable to Wisconsin is to be determined by the application of sec. 71.02 (3) (d) 3, Stats. 1943.

*By the Court.*—Judgment reversed and cause remanded with directions to enter a judgment reversing the decision and order of the Wisconsin board of tax appeals, which judgment shall direct the said board to enter an order affirming the additional assessment as originally determined by the Department of Taxation.

Currie, J. (*concurring*). While I agree with the result reached in the *majority* opinion that Ansul is liable for the amount of tax demanded in the notice of additional assessment of tax, I disagree as to the basis for attaining such result.

It is my conclusion that the Department of Taxation is correct in its contention that the sales of Freon were not sales of Ansul at all, but were sales of Kinetic on orders taken by Ansul.

As the facts are undisputed, the question of whether or not Ansul itself made "sales" of Freon within the meaning of sec. 71.02 (3) (d) 3, Stats. 1943, is unquestionably one of law, and the decision of the board of tax appeals on this point is not entitled to any particular weight. *Ryan v. Department of Taxation* (1943), 242 Wis. 491, 501, 8 N. W. (2d) 393.

There are three written sales-agency agreements in evidence entered into between Ansul and Kinetic, the first expiring on September 30, 1942, the second on September 30,

1943, and the third on September 30, 1944. They are all substantially identical. Each of such agreements is entitled *"Sales Agency Agreement between Kinetic Chemicals, Inc., of Wilmington, Delaware (Manufacturer) and Ansul Chemical Company of Marinette, Wisconsin (Agent)."* Each provides that:

"2. All *deliveries* of said product, pursuant to sales made by agent and *accepted by manufacturer,* shall be made by manufacturer direct to the customer, *title passing directly from manufacturer to the customer.*

"3. Agent's selling authority hereunder shall be limited to the *solicitation of orders* for said product from the following:" (Here follows a list of types of business from which orders may be solicited.) . . .

"5. All orders received by manufacturer from agent shall be subject to *manufacturer's acceptance,* and, after acceptance, to manufacturer's *ability to fill the order.* . . . Agent agrees, when soliciting orders, to inform customers that *all orders are subject to manufacturer's acceptance and ability to deliver, as aforesaid.*

"6. . . . If any customer listed by agent as eligible for credit on *open account* shall become delinquent in paying for goods delivered, manufacturer may suspend such customer's eligibility. . . . Agent shall, however, render every possible assistance to manufacturer in the collection of *overdue* customer accounts, and, in the event that any such account shall not have been collected within *ninety (90) days* from the due date thereof, manufacturer shall be entitled to *retain commissions accruing to agent* hereunder until the delinquent account shall have been satisfied. *The delinquent account* shall then be assigned to agent. . . .

"8. Agent shall sell said product only at *such prices,* on such *terms and conditions,* and by such methods as manufacturer may from time to time direct.

"9. The commission to which agent shall be entitled for agent's services hereunder shall be six cents ($0.06) for each pound of said product which agent shall have sold and for which manufacturer shall have received payment in full, and *agent agrees to accept said commission as full compensation for the performance of agent's services hereunder.* Commissions accruing to agent will be paid to agent on or before

the 25th day of each month next succeeding the month in which the commissions shall have accrued, less, however, such amounts as manufacturer shall have been entitled to retain under the provisions of paragraph 6 hereof.

"10. Except as specifically authorized herein, agent agrees not to make nor attempt to make any sale, contract, agreement, or representation on behalf of manufacturer, nor to hold itself out as authorized so to do. Furthermore, agent agrees not to make any agreements or contracts, *in agent's name and on its own behalf,* with manufacturer's customers for the furnishing of 'Freon-12' to such customers."

There would seem to be no question but what, if the sales of Freon on orders solicited by Ansul had been handled in accordance with the terms of these sales-agency agreements, the sales of Freon would have been the sales of Kinetic and not of Ansul, Ansul being merely the agent who made such sales in behalf of Kinetic and receiving a commission for its services.

The goods being sold at all times were the property of Kinetic and title never passed from Kinetic to Ansul, but instead passed directly from Kinetic to the purchaser. (See paragraph 2 of sales-agency agreement.) All orders obtained by Ansul were subject to Kinetic's acceptance. (See paragraph 5 of sales-agency agreement.) Ansul, in its letter of June 2, 1945, to the department, which constituted its application for abatement of the additional assessment, quoted paragraph 5 of its sales-agency agreement with Kinetic verbatim, and stated that such clause clearly indicated that the consummation of the sale took place in Kinetic's offices and therefore such consummation was outside of Wisconsin.

These written agreements further explicitly provided that Ansul should not make sales of Freon on its own behalf or in its own name. (See paragraph 10 of the sales-agency agreements.)

The fact that the provision contained in paragraph 6 of the sales-agency agreements, under which Ansul guaranteed

collection of the purchasers' accounts which were not paid within ninety days to the extent of commissions due it from Kinetic, is not an unusual or uncommon provision to place in a sales-agency agreement.

Counsel for Ansul seem to tacitly concede that if the sales-agency agreements had been strictly carried out according to their terms, the sales would have been the sales of Kinetic and not of Ansul, but urged that the actual course of dealings between the parties was such as to materially vary the provisions of these agency agreements sufficiently so as to make the sales those of Ansul. Let us therefore examine the facts which might tend to support such contention.

Such facts are as follows: (1) Ansul accepted orders from customers for Freon in its own name, and not as agent for Kinetic, but there is nothing in the record to disclose that Kinetic had knowledge of this. (2) Except as to those customers who paid Kinetic direct because of Kinetic having shipped the goods c.o.d. or sight draft with bill of lading attached (which latter customers paid directly to Kinetic), Ansul remitted to Kinetic on a thirty-day basis the full purchase price of the Freon which Kinetic had had shipped to customers upon orders obtained by Ansul, whether or not such customers had as of date of such remittance paid Ansul, Ansul thereby investing considerable funds of its own which it did not receive back until the customers remitted to it.

There are probably good business reasons why Ansul preferred to handle collections of customer accounts directly instead of having Kinetic do so, because Ansul was selling its customers other refrigerants which it manufactured itself, besides Freon, and it wished to avoid the confusion and disruption of good will which might result if an outside party, such as Kinetic, had handled the collections on sales of Freon.

The significant fact, however, is that in making such remittances, Ansul did not deduct its six per cent commission but remitted the full amount received from the customers, and specified in paragraph 9 of the sales-agency agreement whereby Kinetic remitted such commissions to Ansul at stated intervals was carried out. This is much more consistent with the relationship existing between Kinetic and Ansul being that of principal and agent than it is with being-that of seller and purchaser.

In the record there are documents which were admitted in evidence showing how a sale of Freon to Amarillo Hardware Company of Amarillo, Texas, was handled, such sale being illustrative of the method pursued in other cases. The purchase order came directly from the Amarillo Hardware Company to Ansul without Kinetic's name appearing thereon, and Ansul acknowledged the same in its own name, and not as agent of Kinetic. Ansul then sent a memorandum to its eastern representative, and this representative issued a "shipping order" to Kinetic in the name of Ansul directing Kinetic to ship the Freon to Amarillo Hardware Company, "terms open." Kinetic then issued an acknowledgment showing that Freon was to be shipped to Amarillo Hardware Company, Amarillo, Texas, and charged to

> Amarillo Hardware Company
> 600 Grant St.
> Amarillo, Texas
> Address—Ansul Chemical Company, agent
> Trusteeship.

Kinetic's invoice for this sale shows that the sale was made to

> Amarillo Hardware Company
> 600 Grant St.
> Amarillo, Texas
> Address—Ansul Chemical Company, agent
> Trusteeship.

It does not seem to me that the variance in procedure between that specified in the sales-agency agreements, and the actual method which was followed by Ansul, established a relationship of seller and purchaser which would be necessary in order to find that the sales of Freon became Ansul's sales rather than Kinetic's. In the illustrative case of the sale to the Amarillo Hardware Company it would seem that Ansul was in reality acting as agent for an undisclosed principal.

In 2 Am. Jur., Agency, p. 321, sec. 410, it is stated:

"It is well recognized as a general rule that where a sale is made by an agent in his own name, without the disclosure of his principal, the latter may sue in his own name to collect the purchase price."

In other words, the fact that Ansul concealed from its own customers from whom it received orders for Freon, that it was acting as agent for Kinetic in procuring such orders, would not have prevented Kinetic from suing and recovering the purchase price directly from the customer, prior to the customer having paid Ansul. This being so, the sale of the Freon to the customer is properly a sale between Kinetic and the customer and not a sale by Ansul. Ansul procured the order and transmitted it to Kinetic and no sale took place until Kinetic accepted such order. When shipment was made title passed directly from Kinetic to the customer and did not go through Ansul. The fact that Ansul financed the credit by remitting in advance of the customer paying Ansul is immaterial because Ansul voluntarily chose this method of handling the credit rather than letting Kinetic attempt to collect from the customer, Ansul being liable for the amount of the unpaid account to the extent of all commissions then or thereafter due from Kinetic in the event the customer did not pay within ninety days.

The department in its brief states:

"If the taxpayer's transactions in Freon were not sales by the taxpayer, then the income from those transactions is not used in determining the apportionment ratio. If that income was income from personal services, it would be deductible from the total net income and not be subject to the apportionment formula at all, as it would be allocated to Wisconsin because as income from personal services it has a situs at the domicile of the recipient. If, however, the taxpayer's income from the Freon transactions was neither income from sales by the taxpayer nor income from personal services, then it would be miscellaneous income and as such included in the income to which the apportionment ratio is applied. The result is that a greater tax than was assessed by the appellant is payable by the respondent taxpayer if its income from these transactions is not income from sales of Freon but from personal services or is miscellaneous income."

I am inclined to the opinion that the income from commissions received from sales of Freon is miscellaneous income to Ansul and not properly income from "personal services." However, I can find no support in the statutes for the contention of the department that it is entitled to have either the board of tax appeals, or the trial court, assess a greater tax than that set forth in the notice of assessment from which Ansul took its appeal. No authorities are cited by the department in support of its contention that a tax in excess of the amount stated in the notice can be determined by either the board of tax appeals, or the trial court, and I am of the opinion that the department cannot be sustained in its contention in this respect in the absence of express statutory provisions so providing.

MARTIN and BROADFOOT, JJ., took no part.