GLOBE-UNION, INC., Respondent, v. DEPARTMENT OF
TAXATION, Appellant. [Two cases.]

*April 30—June 4, 1963.*

214

"...

"...

For the appellant the cause was argued by *Harold H. Persons,* assistant attorney general, with whom on the briefs was *George Thompson,* attorney general.

For the respondent there was a brief by *Michael, Best & Friedrich,* attorneys, and *John S. Best* and *Frank J. Pelisek* of counsel, all of Milwaukee, and oral argument by *John S. Best.*

GORDON, J.  Globe-Union filed Wisconsin income-tax returns for the years 1950 through 1952 disclosing that it was engaged in business both within and without the state of Wisconsin. The taxpayer determined its Wisconsin income on the basis of the apportionment method described in sec. 71.07 (2), Stats. 1949. Under this statute, there is applied to apportionable income a figure obtained by averaging the ratio of Wisconsin (1) tangible property, (2) cost of manufacture, and (3) sales to the total of such elements for the entire business.

Globe-Union is a Delaware corporation with its principal office in Milwaukee. It is a unitary business, as that term is defined in *W. R. Arthur & Co. v. Department of Taxation* (1962), 18 Wis. (2d) 225, 230, 118 N. W. (2d) 168.

In determining the sales factor pursuant to sec. 71.07 (2) 3, Stats., the taxpayer assigned to Wisconsin as "sales made by or through offices, agencies or branches located in Wisconsin" only those sales of items which were shipped from Wisconsin factories. The Department of Taxation, on the other hand, concluded that all of the taxpayer's sales were "made by or through" the home office in Milwaukee, and therefore the department set the Wisconsin "sales" per-

centage in the apportionment formula at 100 percent for each of the three years in question.

Globe-Union was engaged in the manufacture and sale of auto storage batteries and electronic components, which it manufactured in factories throughout the United States. It also was engaged in the manufacture and sale of roller skates and spark plugs, which were manufactured exclusively in Wisconsin.

The issue which the court must resolve is whether the various sales in question were "made by or through offices, agencies or branches located in Wisconsin" within the meaning of sec. 71.07 (2), Stats. 1949. The circuit court concluded that Wisconsin sales should include only the sales of storage batteries which were shipped to customers from factories in Wisconsin and sales of roller skates and spark plugs which were shipped to customers from facilities in Wisconsin. The taxpayer conceded that the sales of the electronic components by its Centralab division were to be treated as Wisconsin sales.

A determination of the issue before the court necessitates a consideration of the nature of the company's sales.

### Battery Sales.

In addition to its factory in Milwaukee, the taxpayer operated 12 other factories located throughout the United States which manufactured storage batteries. Almost 65 percent of its sales of storage batteries in the years in question were made to Sears, Roebuck & Company. These sales were controlled by a long-term, comprehensive written contract between the taxpayer and Sears. By the terms of this agreement, executed in Milwaukee, the taxpayer agreed to manufacture and sell to Sears 75 percent of the latter's annual requirement of batteries. The agreement with Sears required Globe-Union's prices to be competitive with prices

offered by other battery manufacturers, and it set up a technique whereby Sears could buy batteries elsewhere in the event that Globe-Union's prices did not remain competitive.

The contract further provided that as Sears battery needs were determined a requisition would be sent to the nearest factory of Globe-Union, and the latter factory would ship the batteries to the retail store. This technique gave recognition to the economic wisdom of transporting the batteries for as short a distance as possible.

Another large segment, about 15 percent, of Globe-Union's battery sales were pursuant to broad contracts with Gulf Tire & Supply Company, B. F. Goodrich Rubber Company, and Sun Oil Company. These contracts, like the contract with Sears, were executed by Globe-Union's officials who were headquartered in Milwaukee.

The remaining battery sales were sold on a per-order basis without any underlying written contract and went to large users such as Ford Motor Company and the United States government.

Globe-Union employed about 10 salesmen who employed their efforts to promote the Globe-Union products. Eight of these so-called salesmen were located outside Wisconsin. None of them were authorized to enter into binding sales contracts, and an examination of their duties evidences that they functioned more as promoters or public-relations representatives for Globe-Union than as order-takers.

*Sales of Spark Plugs and Roller Skates.*

The same contract between Globe-Union and Sears which covered batteries also included spark plugs and roller skates. Sears agreed to purchase 75 percent of its annual requirement of spark plugs and roller skates from Globe-Union. As previously noted, all skates and spark plugs sold by Globe-Union were manufactured in Wisconsin, and many

of the Sears requisitions for those products were filled from the Milwaukee office. However, some of the requisitions were filled from stocks of skates and spark plugs which were kept in warehouses outside of Wisconsin.

Globe-Union sold its roller skates to a large number of customers other than Sears. Purchasers included department stores, hardware stores, and toy shops. Orders for most of such customers were placed at and filled from the Milwaukee plant, but some were filled from inventories kept by Globe-Union at its other warehouses.

Skate sales to purchasers other than Sears were handled through independent manufacturers' agents. These manufacturers' agents were independent contractors who were paid on a commission basis.

During the period in question Globe-Union sold spark plugs to only two customers other than Sears: Skelly Oil Company and Cities Service Oil Company. Orders from these two companies were placed at and filled from the Milwaukee office.

The foregoing facts relating to the nature of Globe-Union's sales are not in serious dispute; the legal consequences which flow from these facts, however, are significantly in issue. We consider that the determination of where the sales in question were made presents primarily a question of law. In our review of the conclusions of the board of tax appeals, there is applicable what this court recently stated in *Pabst v. Department of Taxation* (1963), 19 Wis. (2d) 313, 323, 120 N. W. (2d) 77:

"Nevertheless, in fields in which an agency has particular competence or expertise, the courts should not substitute their judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions."

### The Trial Court's Analysis.

Judge WILKIE concluded that the regulation recited above is repugnant to the statute. He noted that the agreement with Sears was a contract to sell as opposed to a sale. No sale actually took place until an order was received and filled. Reference was made to the Uniform Sales Act, sec. 121.01, Stats.

The trial court further pointed out the various incidents of the transactions which took place outside of Wisconsin. Orders were received from and invoices mailed to customers outside of Wisconsin. Shipments of merchandise took place from factories and warehouses outside of Wisconsin, and points of delivery were outside of Wisconsin.

Thus, the trial court concluded that "the market" was in part outside of Wisconsin and that it would be inappropriate to penalize a company with headquarters in Wisconsin by taxing its sales as 100 percent in this state.

### Major Wisconsin Participation.

We reach a conclusion contrary to that of the trial court. Our analysis of the nature of the sales of Globe-Union persuades us that the participation of the Wisconsin office in the total sales picture was crucial. Compared to the sales activities which were performed outside of Wisconsin, what was done within Wisconsin was major and significant.

The basic contracts were executed by the Wisconsin officers. The entire price structure, insofar as it was influenced by Globe-Union's negotiations, was the product of activities of the Wisconsin office. Cost determinations as well as engineering specifications were calculated in Wisconsin. Payments were made to Wisconsin, and the books were kept at the home office in this state.

If the competitive-price negotiations were activated under the Sears contract, the deliberations of Globe-Union on this subject would be conducted in Wisconsin. The renego-

tiations of billings were to be handled by the home office in Wisconsin. All of these considerations demonstrate that Wisconsin's participation in the sales picture was far more than the "incidental management" referred to in *United States Glue Co. v. Oak Creek* (1915), 161 Wis. 211, 219, 153 N. W. 241, affirmed, 247 U. S. 321, 38 Sup. Ct. 499, 62 L. Ed. 1135. In *Department of Taxation v. Ansul Chemical Co.* (1951), 260 Wis. 96, 102, 49 N. W. (2d) 893, we stated the following:

"The activities of the Wisconsin office which Ansul relies on to show it was a vendor go far beyond the limits of the incidental management of a branch's business. They are an important part of Ansul's sale to the customer and must certainly be construed as business transacted in Wisconsin, through the Marinette office, and productive of the income in question."

We do not regard the case of *American Stores Dairy Co. v. Department of Taxation* (1945), 246 Wis. 396, 17 N. W. (2d) 596, as controlling. Although the taxpayer in that case had its office in Illinois, it was held that its income had a Wisconsin situs. However, the sales of the product in the *American Stores Dairy Co. Case* were made by the taxpayer as a wholly owned subsidiary to its parent corporation. Its home office (in Illinois) did not play a significant role in effectuating sales, which the home office of Globe-Union did perform in conducting arm's-length negotiations with Sears and its other customers.

Although the company in its tax returns for the years in question reported all sales of roller skates as Wisconsin sales, it took a contrary position before the board of tax appeals.

All the roller skates were manufactured in Wisconsin, but frequent requisitions were made from warehouses outside of Wisconsin. The company contends that roller-skate orders which were filled from inventories in Los Angeles

and Philadelphia should be treated as sales made outside Wisconsin for purposes of the sales factor in computing its Wisconsin tax returns. The treasurer of Globe-Union testified that the majority of the orders for the sale of roller skates that did not go to Sears were produced and handled in the same manner as the company's Centralab products. In view of the taxpayer's concession that all Centralab sales are Wisconsin sales, we consider that this should apply to the sale of roller skates.

Our conclusion is that Wisconsin had not only more than an incidental role in the sales of all products, but also by comparison to the sales activities conducted outside of Wisconsin, the role of the Wisconsin office was a major factor in all sales of Globe-Union.

### The Constitutional Issue.

Globe-Union urges that the inclusion of 100 percent of sales in the Wisconsin apportionment formula would violate the provisions of the Fourteenth amendment to the United States constitution. The company relies upon *Hans Rees' Sons v. North Carolina* (1931), 283 U. S. 123, 135, 51 Sup. Ct. 385, 75 L. Ed. 879. The latter case held that an unreasonable formula for apportionment which allocates to a state income which is not the result of business transacted there or property located in such state constitutes a deprivation of property without due process of law.

In our opinion, the conclusion reached by the board of tax appeals does not contravene the Fourteenth amendment, but, on the contrary, consists of a composite formula reasonably directed at taxing in Wisconsin only such income of the taxpayer which is properly allocable to this state. *Butler Brothers v. McColgan* (1942), 315 U. S. 501, 62 Sup. Ct. 701, 86 L. Ed. 991.

The inclusion of one hundred percent of sales does not constitute an abuse of the taxpayer's interests merely be-

cause manufacturing is performed partly outside of Wisconsin. The taxing formula consists of three parts, and the existence of manufacturing outside of Wisconsin is reflected in either or both the tangible-property factor or the cost-of-manufacturing factor.

### The Attorney General's Brief.

There are two matters touching upon the attorney general's brief which we believe should be mentioned. The respondent felt compelled to restate the facts of the case in their entirety because of its belief that the attorney general's brief was "replete with argumentative statements." We have reluctantly concluded that this criticism by the respondent was justified.

The attorney general's brief has also been reproved by the respondent for its "biting attack" on the opinion of the trial judge. While we disagree with Judge WILKIE's conclusions, we consider that he submitted an analytical and scholarly opinion which did not merit reproach. We would have preferred that the appellant had disagreed with the views of the trial court without disparaging such views.

*By the Court.*—Judgments reversed, with directions to enter judgments affirming the orders of the Wisconsin board of tax appeals.

WILKIE, J., took no part.